PEOPLE v RAPPUHN

1. Homicide—Premeditation—Evidence—Inferences.

Premeditation may be inferred from the facts and circumstances surrounding a killing.

2. Homicide—Premeditation—Question for Jury—Appeal and Error.

Premeditation is a question for the jury and on appeal a jury's finding of premeditation will not be disturbed unless there is no evidence which would support a reasonable inference thereof.

3. Homicide—Premeditation—Evidence—Second Look.

Sufficient evidence was produced to support a reasonable inference of premeditation where testimony clearly established that the defendant left the victim's apartment to remove a knife from his pocket and open the blade, and returned to the apartment to repeatedly stab the victim; the trip outside the apartment to open the knife and the pauses of the defendant between stabbings indicate the presence of the "second look" necessary to a finding of premeditation.

4. Criminal Law—Trial—Objection to Error—Preserving Question.

Counsel cannot sit back and harbor error to be used as an

References for Points in Headnotes

[1] 40 Am Jur 2d, Homicide § 264.
    Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.
[1, 2] Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.
[2] 40 Am Jur 2d, Homicide § 472.
[3] 40 Am Jur 2d, Homicide §§ 50, 264, 438, 439.
[4] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*
[5] 29 Am Jur 2d, Evidence §§ 430, 431, 433.
    Admissibility of evidence obtained by wire tapping as affected by § 605 of Federal Communications Act—federal cases. 2 L Ed 2d 1603.
    Admissibility of evidence obtained by government or other public officer by intercepting letter or telegraph or telephone message. 134 ALR 614.

appellate parachute in the event of a jury failure and should make any relevant objections during the course of the trial.

5. CONSTITUTIONAL LAW—CRIMINAL LAW—EVIDENCE—TELEPHONE CONVERSATIONS—CONSENT.

The Federal Constitution does not protect a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it; therefore, a defendant's constitutionally protected rights were not violated by the admission of testimony regarding a telephone conversation which was voluntarily entered into by the defendant with a brother who had consented that the conversation be overheard by the police.

Appeal from Oakland, James S. Thorburn, J. Submitted Division 2 June 13, 1974, at Lansing. (Docket No. 18472.) Decided August 14, 1974. Leave to appeal applied for.

Keith Rappuhn was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, and *Sandra M. Kabboush,* Assistant Prosecuting Attorney, for the people.

*Geoffrey H. Davis,* for defendant.

Before: QUINN, P. J., and V. J. BRENNAN and CARLAND,* JJ.

CARLAND, J. The defendant was charged in an information alleging an open count of murder arising as the result of the slaying of one Glenda Joyce Moss on February 8, 1971. Following a preliminary examination, the defendant was bound over to the circuit court for trial on such open count of murder contrary to MCLA 750.316; MSA 28.548; MCLA 750.317; MSA 28.549. Following jury trial, the defendant was convicted of

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

murder in the first degree and appeals as a matter of right.

The victim was discovered by her husband upon his return from work in the early morning hours of February 8, 1971. Upon entering his apartment, the husband was able to see his wife lying nude upon a mattress which apparently had been removed from the bed and placed upon the floor. She was covered with blood and her wrists and throat had been slashed. There was blood throughout the area. The husband notified the police and covered the body with a blanket. Mrs. Moss was last seen by a neighbor, Janice Dukette, as the victim returned to her apartment after making a telephone call between the hours of 9:30 and 10 p.m. A short time thereafter this neighbor heard someone come upstairs and knock on the Moss door.

Investigation by the police after receiving the husband's call revealed that death had ensued and that the victim had been slashed and stabbed over almost her entire body and red stains smeared the walls. A wine bottle was seized in order that it might be processed for fingerprints.

An autopsy was performed by Dr. John Burton, Oakland County Medical Examiner, who concluded that death was caused from shock and hemorrhage due to some 60 stab wounds found upon the body. He further concluded that all of the wounds were attributable to the same instrument.

James Lafnear testified that in the early hours of February 8th the defendant came to his home and that there was blood upon his hands and clothing. The defendant explained that his hands had been cut while attempting to assist a man involved in a serious automobile accident. A check of the police records disclosed that no accident had been reported in the area as claimed by the de-

fendant. Lafnear assisted the defendant in removing most of the blood. Following a phone call, the defendant's brother and father arrived and, after a private conversation, they left the Lafnear home in the company of the defendant. That later that day, the defendant returned and asked Lafnear not to mention the alleged accident. Lafnear also discovered a blood-soaked woman's blouse upon the floor of his utility room which he threw in the garbage after learning that it was unfamiliar to anyone in his household. After reading of the Glenda Moss murder, he contacted the police about this blouse. An eleven-year-old niece of Lafnear testified that she heard the defendant on February 8th telling someone that "he was afraid he was going to prison".

The defendant's brother, Jerry Rappuhn, in contradiction of defendant's story to Lafnear, testified that the defendant had told him that he cut his hand on the horn ring of his own automobile.

Another brother, Robert Rappuhn, testified that on February 8th the defendant told him that he had "hurt a girl", and had cut his hand. That as a result "he was in trouble, and that he didn't really know what to do". The defendant further stated that he knew that the girl was dead.

On another occasion, the defendant disclosed to Robert that he had gone over to the girl's home knowing that she would be alone because her husband worked nights and she had no children. That after having some wine, he left the apartment under the pretense of going to the bathroom and put on gloves and took out a penknife he had in his pocket. That he returned to the apartment and told the girl he was going to have "sex" with her and put the knife to her throat. That she advised him that they could do it on friendlier

terms and that as a result, he had sex with her but was afraid that "she would tell on him". That he tried to choke her but being unsuccessful, began to repeatedly stab her. That he paused only to inquire if she knew him and that each time she repeated his name, he would stab her again. The defendant also admitted striking and kicking the victim.

About a week after this conversation, Robert Rappuhn conferred with Detective Duby of the Pontiac Police. Robert had asked for the conference. After further conversation with the police and an assistant prosecutor, Robert spoke to the defendant over the phone and permitted the police to listen to the conversation. This conversation was testified to by both Robert and Captain Raymond Meggitt, who stated that the defendant spoke of throwing out his shirt and a blouse that was "at Connie's".

The fingerprints lifted at the scene were identified as being the prints of the defendant and the blood samples removed from the site of the murder were identified as being of the same type as those of both the victim and the defendant.

The defendant testifying in his own behalf generally denied the testimony of his brother Robert. Essentially, however, he testified that at his mother's birthday party he drank a considerable amount of beer and whiskey. That thereafter he drove to Glenda's apartment, but because he was drunk, he was unable to recall the route travelled. That Glenda and he arrived at a mutual decision to have "sex" but because of his drinking he was unable to perform. That the victim thereupon expressed her disappointment by "grabbing him in the groin". That because of excruciating pain, he was unable to recall anything from that moment

until he left the apartment and that while realizing that he had stabbed her, he was oblivious as to her condition. On cross-examination he did recall having a knife in his pocket which he had to open in order to expose the blade. He also recalled being nude during the ill-fated lovemaking, and that his clothes were on the floor and that the blade of the knife was not exposed while in his pocket. Although being unable to remember getting dressed, he did know that he left his victim "all bloody".

The defendant maintains on appeal that insufficient evidence of premeditation was produced to support the jury's verdict of first-degree murder. In so doing, he relies upon *People v Allen,* 390 Mich 383; 212 NW2d 21 (1973). We find *Allen* to have no application in the instant case, since *Allen* only held that in a felony murder the "corpus delicti" could not be established by the extrajudicial statements of the defendant alone.

In reaching our decision as to the question here raised by the defendant, we assume that the verdict was reached by a properly instructed jury since no claim to the contrary is here asserted. Further, no claim is made by the defendant or anyone on his behalf that he was not guilty of the murder. Here, as distinguished from *Allen, supra,* the danger of the unreliability of extrajudicial statements of guilt allegedly made to officers or other third parties does not exist, since the judicial confession of the defendant from the witness stand as to his guilt makes the testimony of his brother merely corroborative. The defendant's own testimony in open court is consistent with the testimony of his brother Robert in almost every essential detail, except the defendant's attempt to exculpate himself through his assertion that his attack upon the victim arose because of the pain inflicted

upon him by the deceased rather than because of his fear of recognition.

There is abundant case law to the effect that the fact of premeditation may be inferred from the facts and circumstances surrounding the killing. Whether the defendant premeditated the stabbing and killing of Glenda Moss was a question of fact for the jury. On appeal, the jury's finding of premeditation will not be disturbed unless there is no evidence which would support a reasonable inference thereof, *People v Corsa,* 50 Mich App 479, 482; 213 NW2d 579 (1973); *People v Meier,* 47 Mich App 179, 183; 209 NW2d 311 (1973).

In *Meier, supra,* Judge HOLBROOK developed guidelines which provide an orderly approach to the question of determining the fact of premeditation. At pages 191–192 of *Meier,* he stated:

"Our own answer to the question of the appropriate rule to follow as to what constitutes premeditation in a first-degree murder case is not a definition. Rather, it is a reaffirmation of the role of the trier of fact in deciding the degree of guilt of an accused under the following established principles:

"(1) Premeditation can be reasonably inferred from the circumstances surrounding the killing;

"(2) A defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder;

"(3) A sufficient time lapse to provide an opportunity for a 'second look' may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing;

"(4) Where it is factually clear that there is *no* evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

"Attempting to further clarify this 'definition' in the past has, we believe, led to an invasion by the appellate

courts into areas rightfully left to the trial court in its factfinding processes, with the diverging results we have noted in the cases cited above."

The testimony clearly establishes that the defendant left the apartment and went to the bathroom; that either while there, or at a later point in time, he removed the knife from his back pocket and opened its blade. That, if the defendant's brother was believed by the jury, the defendant repeatedly stabbed the victim out of fear the girl would tell on him, pausing only to inquire as to whether she knew him. By the defendant's own testimony, the victim was repeatedly stabbed after he was grabbed in the groin. That he left the apartment realizing that he had stabbed her although he was oblivious to her condition. The trip to the bathroom and the pauses of the defendant between stabbings would indicate the presence of the "second look" necessary to a finding of premeditation as required by *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971). The attempts made to choke the victim serve also as a basis upon which premeditation might be properly inferred.

Utilizing the criteria of *Meier, supra,* in testing the evidence in the case at bar, we are persuaded that sufficient evidence was produced to support a reasonable inference of premeditation and that, therefore, the jury's finding of this fact should not be disturbed.

We find no merit to defendant's contention that he was improperly bound over for trial by the examining magistrate.

Finally, were the defendant's constitutionally protected rights violated through the admission of testimony as to a telephone conversation that was voluntarily entered into by the defendant with

defendant's brother who had consented to the conversation being overheard by the police?

It should be pointed out that during the course of the trial no objection was made by defendant's counsel to either the testimony of the police officer or to the testimony of Robert Rappuhn concerning this phone conversation.

"Counsel cannot sit back and harbor error to be used as an appellate parachute in the event of a jury failure." *People v Morgan,* 50 Mich App 288; 213 NW2d 276 (1973); *People v Brocato,* 17 Mich App 277; 169 NW2d 483 (1969).

We conclude that this question is clearly answered in *Hoffa v United States,* 385 US 293; 87 S Ct 408; 17 L Ed 2d 374 (1966). Here the Court speaking through Justice Stewart stated:

"Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."

We therefore affirm.